# NO. 12-16-00045-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JEREMY ONEY AND HORIZON CABLE SERVICE, INC., APPELLANTS* | § | *APPEAL FROM THE 124TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *WILLIAM CRIST AND HEATHER CRIST, APPELLEES* | § | *GREGG COUNTY, TEXAS* |

### *OPINION*

Jeremy Oney and Horizon Cable Service, Inc. appeal from a judgment against them and in favor of William "Chip" Crist and Heather Crist. Oney and Horizon present ten issues challenging the trial court's judgment. We affirm in part and reverse and render in part.

### BACKGROUND

The Crists were injured when their vehicle was struck by a Horizon "spooling" truck driven by Oney. According to Oney, the truck weighs approximately 32,000 to 52,000 pounds and is "governed," i.e., it can travel no more than seventy-five miles per hour. On the day of the collision, Oney was traveling in the right lane with the cruise control set on seventy miles per hour. The road was wet from rain. An Escalade, driven by Chip and occupied by Heather, Taylor White, and White's wife, traveled in front of Oney.

Jarron Marshall, who was driving a pickup truck in front of the Crists, lost control of his vehicle and landed in a ditch. Oney and Chip both applied their brakes. Oney decreased his speed to approximately forty-five to fifty miles per hour and locked the truck's axles. Knowing that a collision was inevitable, he slowed down as much as possible, veered left to avoid hitting the Escalade straight on, and clipped the Escalade's left corner. The collision thrust the Escalade

forward near a bridge, but the Escalade did not leave the road or collide with other traffic. Oney testified that his truck entered the ditch and struck Marshall's vehicle.

The Crists sued both Oney and Horizon for injuries sustained as a result of the accident. The jury found that (1) the negligence of Oney and Horizon, but not Marshall, proximately caused the accident; (2) Chip was entitled to $103,898.35 for past medical care, $334,146 for future medical care, $100,000 for past physical pain and mental anguish, $400,000 for future physical pain and mental anguish, $150,000 for past physical impairment, and $600,000 for future physical impairment; (3) Heather was entitled to $105,185.84 for past medical care, $300,000 for future medical care, $100,000 for past physical pain and mental anguish, $400,000 for future physical pain and mental anguish, $250,000 for past physical impairment, and $600,000 for future physical impairment; and (4) Oney and Horizon were grossly negligent. The jury found that Chip and Heather were each entitled to $300,000 in exemplary damages. This appeal followed.

## MARSHALL'S NEGLIGENCE

In issues one and two, Horizon challenges the legal and factual sufficiency of the evidence to support the jury's finding that Marshall was not negligent. According to Horizon, Marshall's negligence led to his loss of control and was the primary, proximate cause of the accident.

### Standard of Review and Applicable Law

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We credit favorable evidence if a reasonable juror could, and disregard contrary evidence unless a reasonable juror could not. *Id*. at 807. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id*. at 827. When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence. *Id*. at 826. We will set aside the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*. Jurors are the sole judges of the witnesses' credibility and the weight to give their testimony. *Id*. at 819. They are entitled to believe one witness and disbelieve another. *Id*. We are not permitted to impose our own opinions to the contrary. *Id*.

To establish negligence, a plaintiff must prove (1) a legal duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Lee Lewis Constr. Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). Proximate cause is comprised of cause-in-fact and foreseeability. *Id*. at 784. "The test for cause-in-fact is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.'" *Id*. (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995)). Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligence created for others. *Id*. at 785. The "injury need only be of a general character that the actor might reasonably anticipate." *Id*. "More than one act may be the proximate cause of the same injury." *Id*. at 784.

## Analysis

The jury found that Oney and Horizon were negligent, but that Marshall was not. The record demonstrates that Marshall lost control of his vehicle. White testified that Marshall "gunned it" just before losing control. According to Marshall, his vehicle began "fishtailing." Having heard a "pop," he believed that one of his tires had blown out. However, Texas State Trooper Robbie Dillard testified that his report contained no documentation of a blow-out and he found no evidence of a blow-out at the scene. Oney testified that, after the accident, Marshall apologized and told him that he had "spun out" and installed a "souped-up" motor in his truck. Oney guessed that the truck "got away from [Marshall]" as a result of "over-acceleration." White testified that Marshall's truck had a V8 engine, which White testified is a large engine. He testified that he recorded a conversation immediately after the accident, but he could not locate the recording and did not recall any specific statements made on the recording. He believed that admissions of fault by Oney and Marshall would have been on the recording. Chip testified that White gave him a copy of the recording, but the recording would not play.

Trooper Dillard testified that Marshall lost control because he was driving at an unsafe speed during wet road conditions, which started the chain of events that led to the collision. He acknowledged that there is no reason to believe that Oney would have struck the Crists had Marshall not lost control of his vehicle. Marshall acknowledged that his loss of control possibly set in motion the events of that day.

The jury also heard Trooper Dillard testify that, regardless of Marshall's actions, there would not have been a collision between the Horizon truck and the Escalade had Oney controlled

3

his speed. Dillard cited Oney for failure to control his speed because Oney could not control his vehicle and avoid striking the Escalade. He explained that failure to control speed occurs when a vehicle's speed is unreasonable under the circumstances or conditions, and the driver's lack of control results in a collision. He agreed that Oney needed to drive at a distance sufficient to avoid striking another vehicle and should not have been driving too fast, too close, on a wet road, and with his cruise control set on seventy miles per hour. Dillard testified that, in his experience, a driver does not set the cruise control in wet road conditions. Additionally, the jury heard evidence that, although the Crists were driving directly behind Marshall, they were able to avoid either leaving the roadway or striking another vehicle when Marshall lost control. White believed that if Oney had driven as reasonably as Chip, the accident would not have happened.

Ronald Dean Savage, II, Horizon's assistant general manager and former safety director, acknowledged that a driver must decrease his speed when driving in the rain, and keep a sufficient distance between himself and the vehicle in front of him so that he can avoid a collision. Oney admitted that a reasonable, prudent driver has a duty to drive a vehicle in such a way as to be able to stop before colliding with another vehicle. He also agreed that it was not a good idea to set the cruise control while driving in wet conditions. Shane Risley, Horizon's general manager and vice-president, agreed that the accident appeared to be Oney's fault.

As sole judge of the weight and credibility of the evidence, the jury could reasonably conclude that, despite Marshall's actions, Oney should have anticipated the dangers of driving too fast and too close to the Crists in wet road conditions. *See **Harrison***, 70 S.W.3d at 785. Accordingly, the jury could also reasonably conclude that Oney's conduct was a substantial factor in causing the Crists' injuries and that, absent Oney's failure to control his speed, harm would not have occurred to the Crists. *See **Wilson***, 168 S.W.3d at 819; *see also **Harrison***, 70 S.W.3d at 784. Furthermore, the jury could reasonably conclude that Marshall's conduct did not cause the Crists' injuries. Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support the jury's conclusion that Oney, not Marshall, was negligent. *See **Wilson***, 168 S.W.3d at 824. The jury's finding is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See **id***. at 826. We overrule issues one and two.

4

In issue three, Horizon challenges the legal sufficiency of the evidence to support negligent entrustment. Specifically, Horizon maintains that the evidence fails to establish that (1) Oney was an incompetent or reckless driver, and (2) Horizon knew or should have known that Oney was an incompetent or reckless driver.

**Applicable Law**

To establish negligent entrustment, a plaintiff must show (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed, incompetent, or reckless; (4) that the driver was negligent on the occasion in question; and (5) that the driver's negligence proximately caused the accident. *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987). "For entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment." *Id*. The plaintiff must prove that the risk that caused the entrustment to be negligent caused the accident at issue. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 240 (Tex. 2010).

Incompetence or recklessness may be established by the employee's driving record and habits, as well as his condition, situation, or state at the time he is loaned the vehicle. *Revisore v. West*, 450 S.W.2d 361, 364 (Tex. Civ. App.—Houston [14th Dist.] 1970, no pet.). Entrustment may be negligent when the employee is physically or mentally incapacitated, intoxicated, or lacking in judgment or perception. *Id*.

**Facts**

Regarding Oney's driving history and habits, Oney testified that he has a commercial driver's license, which has never been revoked, and several years of experience driving various trucks. He admitted being terminated by previous employers, but only one involved a driving infraction. Specifically, he was terminated after striking a fence post. Oney included his employment history on his job application with Horizon. Savage testified that Oney has a clean driving record and there have been no complaints regarding his driving.

Oney also admitted that his driver's license lists a restriction that he is to drive while wearing corrective lenses, but he gave conflicting statements as to whether he wore those lenses on the day of the collision. He further admitted having a previous "conviction" for possession of an open container of alcohol while in an eighteen-wheeler. But, he explained that he was never

5

arrested, cited, or appeared in court for the offense. The offense occurred five or six years before Oney applied for the job at Horizon and was listed on Oney's job application. The record indicates that Horizon did not have Oney drug tested until several hours after the collision, even though testing was available. However, Trooper Dillard testified that Oney did not appear to be intoxicated at the scene of the collision. Savage testified that Oney's drug tests have all been negative.

Regarding Oney's training and experience, the record indicates that Oney had worked for Horizon approximately thirty four days before the collision. According to Savage, Oney completed an employment application while Horizon's CDL driver, Joseph Modisette, was on another job. Horizon's yard manager, Jody Nolen, who does not hold a CDL, administered Oney's driving test. Savage explained that Nolen understood the truck's logistics and merely gave Oney a small test drive. The record indicates that Nolen was eventually terminated for various reasons, including dishonesty. However, Savage testified that Modisette handled Oney's trial period. Risley testified that if he could go back in time, he would not have allowed Oney to drive the truck.

Oney testified that Horizon trained him to drive a small spooling truck, which he drove for two to three weeks. He learned how to operate the truck and received safety training. He had been driving the large spooling truck for approximately one week before the collision. In his deposition, Oney agreed that the collision would not have occurred had he been properly trained. But, at trial, he explained that his training enabled him to minimize the damage because, without any training, he probably would have struck the Escalade straight on at seventy miles per hour. He believed that his training prompted him to slow down and veer away from the Escalade to reduce the damage.

Regarding Oney's condition, situation, or state, the record indicates that Oney worked approximately fourteen hours on the day of the collision. During his deposition, Oney complained that the accident occurred, in part, because he sometimes did not have a day off when business was heavy. He stated he was probably fatigued because of the long hours he worked in the previous days. According to Oney, he was required to work even after informing Horizon that he felt fatigued, and in violation of federal regulations. When asked if he thought Oney was fatigued at the time of the accident, White stated that the fact Oney struck the Escalade when he had an opportunity to avoid the collision indicates that "something was not right."

6

Savage and Risley both acknowledged that fatigued drivers should not be allowed on the roadway and that fatigue can affect a driver's reaction time. However, Savage testified that Oney never complained of being overworked or working in violation of federal regulations. At trial, Oney denied telling anyone to stop forcing him to drive more than federally authorized. He testified that he was off work the three days before the collision, and had additional days off in the two weeks before the collision. He testified that he was not fatigued at the time of the collision, and was in compliance with federal regulations. Trooper Dillard testified that Oney did not mention feeling fatigued when at the scene of the collision. He testified that he would have listed fatigue as a contributing factor had he been informed of any such issue.

**Analysis**

The evidence in this case demonstrates that Oney was a licensed driver and, with one minor exception, had not been involved in prior accidents. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007) (stating that prior citations for driving without liability insurance, for rear-ending another vehicle, and for speeding insufficient to establish incompetence or recklessness); *see also Mireles v. Ashley*, 201 S.W.3d 779, 783 (Tex. App.—Amarillo 2006, no pet.) (stating that "[p]roof of one previous traffic violation is grossly inadequate to establish a driver's incompetency or recklessness[]"). Moreover, the record does not substantiate that Oney was actually convicted of a possession offense. The offense is several years old, and the record is devoid of evidence showing that Oney was intoxicated when the collision occurred or has a history of intoxication.

Additionally, there must be more than an owner's general awareness of an employee's fatigue. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 406 (Tex. 2009). The employer must have actual knowledge that its employee was impaired when leaving work on the day of the accident. *Id*. Given that Oney had time off in the days before the collision and the record does not indicate that Oney was fatigued on the day of the collision, it is unreasonable to conclude that Horizon knew or should have known that Oney was incompetent or reckless due to fatigue. *See id*.; *see also Mayes*, 236 S.W.3d at 758 (stating that driver's long work week, lengthy commute, and work schedule failed to create fact issue that driver was, or employer knew or should have known that he was, incompetent due to insufficient sleep).

The record also indicates that Oney received training to drive a spooling truck, had experience driving other commercial vehicles, and had operated the truck on other occasions

without incident.  Even the absence of formal training does not establish that a driver is incompetent or reckless.  *See **4Front Engineered Sol., Inc. v. Rosales***, 505 S.W.3d 905, 910-11 (Tex. 2016).  There is no evidence of Oney's habits or prior experiences that would tend to show that he could not competently operate the spooling truck or would do so recklessly.  *See **id***. at 910.  It is insufficient that Horizon knew or should have known that Oney might have a momentary lapse in judgment or otherwise act negligently.  *See **id***. at 911.

The evidence of Oney's driving record, habits, condition, situation, and state does not establish that, at the time Horizon entrusted the truck to Oney, he was an incompetent or reckless driver, or Horizon knew or should have known that he was an incompetent or reckless driver.  *See **id.*** at 910-11; *see also **Mayes***, 236 S.W.3d at 758; ***Schneider***, 744 S.W.2d at 596; ***Revisore***, 450 S.W.2d at 364.  There is no evidence tending to show that Oney could not competently operate the spooling truck or would do so recklessly, and evidence of his negligence is not tantamount to evidence of recklessness.  *See **Rosales***, 505 S.W.3d at 910-11.  Thus, viewing the evidence in the light most favorable to the verdict, we conclude that reasonable and fair-minded people could not reach the conclusion that Horizon negligently entrusted the spooling truck to Oney on the day of the collision.  *See **id**.; see also **Wilson***, 168 S.W.3d at 827.  We sustain issue three.


## GROSS NEGLIGENCE

In issues four, five, and six, Horizon challenges the legal sufficiency of the evidence to support the jury's findings that Oney and Horizon were grossly negligent, as well as the jury's awards of exemplary damages.

### Standard of Review and Applicable Law

When reviewing an award of exemplary damages for gross negligence, we conduct a legal sufficiency review under the "clear and convincing" evidence standard.  ***U-Haul Int'l, Inc. v. Waldrip***, 380 S.W.3d 118, 137 (Tex. 2012).  Clear and convincing evidence is that measure or degree of proof that will produce within the jury's mind a firm belief or conviction as to the truth of the allegations sought to be established.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.001(2), 41.003(b) (West Supp. 2016 & West 2015); *Waldrip*, 380 S.W.3d at 137.

Gross negligence includes the following elements: (1) viewed objectively from the actor's standpoint, the act or omission complained of involves an extreme degree of risk,

considering the probability and magnitude of the potential harm to others; and (2) the actor had actual, subjective awareness of the risk, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West Supp. 2016); *Waldrip*, 380 S.W.3d at 137. "'[E]xtreme risk' is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury." *Waldrip*, 380 S.W.3d at 137. Actual awareness means that the defendant knew about the peril, but his actions or omissions demonstrate that he did not care. *Harrison*, 70 S.W.3d at 785.

## Analysis

Exemplary damages may be imposed when "the owner of the vehicle knows or should have known that the entrusted driver was incompetent or habitually reckless and the owner was grossly negligent in entrusting the vehicle to that driver." *Schneider*, 744 S.W.2d at 596. As previously discussed, there is no evidence supporting a finding that Horizon knew or should have known that Oney was reckless or incompetent. Accordingly, the record cannot support the heightened standard for gross negligence, i.e., that Horizon actually knew Oney was incompetent, much less habitually reckless. *See id*. There is simply no evidence that Horizon knew, but was consciously indifferent to, any risks associated with entrusting the spooling truck to Oney. *See Waldrip*, 380 S.W.3d at 140. Therefore, the evidence does not rise to the level from which a reasonable factfinder could have formed a firm belief or conviction that Horizon knew about a peril caused by Oney's driving but its acts or omissions demonstrate that it did not care about the rights, safety, or welfare of others. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2), (11); *see also Waldrip*, 380 S.W.3d at 137; *Harrison*, 70 S.W.3d at 785.

Nor is the evidence sufficient to establish gross negligence against Oney. An act or omission is grossly negligent only when it is unjustifiable and likely to cause serious harm. *Reeder v. Wood Cty. Energy, L.L.C.*, 395 S.W.3d 789, 797 (Tex. 2012). In this case, Oney acted negligently by following too closely and speeding in wet road conditions, with his cruise control set on seventy. However, conscious indifference is not satisfied by proof of negligence. *Agrium U.S., Inc. v. Clark*, 179 S.W.3d 765, 767 (Tex. App.—Amarillo 2005, pet. denied). Additionally, "[a]n act or omission that is merely ineffective, thoughtless, careless, or not inordinately risky is not grossly negligent." *Reeder*, 395 S.W.3d at 797. Thus, Oney's failure to pursue the safest course available or to comply with traffic laws does not give rise to conscious indifference. *See Clark*, 179 S.W.3d at 767. For these reasons, a reasonable factfinder could not

9

have formed a firm belief or conviction that Oney's actions amount to conscious indifference. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2), (11); *see also* **Waldrip**, 380 S.W.3d at 137; **Harrison**, 70 S.W.3d at 785.

Accordingly, we conclude that the Crists failed to offer clear and convincing evidence establishing that either Horizon or Oney acted with the requisite subjective awareness or conscious indifference. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11); *see also* **Waldrip**, 380 S.W.3d at 137. Absent clear and convincing evidence establishing gross negligence, the record fails to support an award of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a)(3) (West 2015). Thus, we sustain issues four, five, and six.

## PROPORTIONATE RESPONSIBILITY

In issue seven, Horizon maintains that the trial court failed to comply with section 33.003(a)(2) of the Texas Civil Practice and Remedies Code by excluding Horizon from the proportionate responsibility question presented to the jury.[1]

### Standard of Review

We review complaints regarding charge error for abuse of discretion. **Thota v. Young**, 366 S.W.3d 678, 687 (Tex. 2012). We will not reverse a judgment for charge error unless the error was harmful. **Id**.; TEX. R. APP. P. 44.1(a).

### Analysis

Question one of the jury charge asked the jury to find whether Oney, Horizon, and Marshall were negligent. Question two asked the jury what percentage of negligence was attributable to Oney and Marshall, but did not include Horizon.[2] On appeal, Horizon contends that the trial court abused its discretion by failing to include Horizon in question two. The Crists contend that Horizon failed to preserve issue seven for appellate review.

However, we need not determine whether error was preserved or whether the jury charge was erroneous. As previously discussed, the evidence does not support Horizon's independent liability for negligent entrustment. Thus, all that remains is its vicarious liability. Determining

---

[1] Section 33.003 provides, in pertinent part, that the trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility with respect to each defendant's causing or contributing to cause in any way the harm for which recovery of damages is sought. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a)(2) (West 2015).

[2] Having declined to find Marshall negligent, the jury did not answer question two.

the applicable percentage of liability does not apply to a defendant who is vicariously liable. *Pierre v. Swearingen*, 331 S.W.3d 150, 154 (Tex. App.—Dallas 2011, no pet.); *see Pilgrim's Pride Corp. v. Burnett*, No. 12-10-00037-CV, 2012 WL 381714, at *7 (Tex. App.—Tyler Feb. 3, 2012, no pet.) (mem. op.) (stating that submission of the employer's negligence is improper when the sole basis for its liability is vicarious). Because we have already concluded that Horizon's sole basis for liability is vicarious, we need not determine whether the trial court abused its discretion by excluding Horizon from the proportionate responsibility question in the jury charge. *See* TEX. R. APP. P. 47.1. We overrule Horizon's seventh issue.

## JOINT AND SEVERAL LIABILITY

In issue eight, Horizon argues that the jury's verdict fails to support joint and several liability because (1) the jury was not asked to apportion fault between Oney and Horizon; and (2) Oney is not responsible for any negligence committed by Horizon.

### Analysis

Oney and Horizon stipulated that Oney was an employee of Horizon and was acting in the course and scope of his employment with Horizon when the accident occurred. Given that Horizon is not independently liable under a negligent entrustment theory, its sole liability is vicarious. "[V]icarious liability is joint and several." *AAMCO Transmissions, Inc. v. Bova*, 484 S.W.3d 520, 525 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Because Horizon is vicariously liable for Oney's negligence, the trial court did not err by holding Oney and Horizon jointly and severally liable. *See Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984) (stating that appellate court correctly affirmed judgment holding employee and employer jointly and severally liable for actual damages from libelous letter written by employee in course of employment); *see also Bova*, 484 S.W.3d at 525; *Pierre*, 331 S.W.3d at 154-55. We overrule issue eight.

## EXPERT TESTIMONY

In issue nine, Horizon contends that Dr. Calodney's testimony regarding Heather's need for neurotomies, stem cell injections, and topical cream is unreliable and conclusory. Thus, according to Horizon, Dr. Calodney's testimony was legally insufficient.

11

**Standard of Review and Applicable Law**

We review a trial court's ruling on the admission of expert testimony for abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). "[A] party may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict." *Id*. "[I]n a no-evidence review we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict." *Id*. A no-evidence review "encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Id*.

When determining whether an expert's opinion is reliable, we consider several factors: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the expert's subjective interpretation; (3) whether the theory has been subjected to peer review and/or publication; (4) the potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). We also consider the expert's experience, knowledge, and training. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 215-16 (Tex. 2010). The reliability factors are non-exclusive and the inquiry is flexible. *Robinson*, 923 S.W.2d at 557.

Expert testimony is also unreliable when there is too great an analytical gap between the data on which the expert relies and the opinion offered by the expert. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 349 (Tex. 2015). "Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion." *Id*. Analytical gaps may arise when the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the record, or the expert's opinion is based on tests or data that do not support the conclusions reached. *Id*. An expert's testimony is conclusory when there is no basis for the expert's opinions or the basis offered provides no support for the expert's opinions. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009).

**Analysis**

In a motion in limine, Horizon challenged Dr. Calodney's testimony regarding future medical treatment using stem cell injections and repeat radiofrequency neurotomies on grounds of unreliability. After a ***Daubert*** hearing, the trial court ruled that Dr. Calodney could testify as to these subjects. The record does not indicate that Horizon challenged the reliability of Dr. Calodney's testimony on the issue of topical pain cream. *See **Coastal Transp. Co. v. Crown Cent. Petroleum Corp.***, 136 S.W.3d 227, 233 (Tex. 2004) ("when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis"). Thus, our review regarding the pain cream is limited to whether Dr. Calodney's testimony is conclusory. *See **id***.

At trial, Dr. Calodney testified that Heather uses a topical pain cream, which contains a muscle relaxant, local anesthetic, and an anti-inflammatory. Dr. Candido testified that he disagreed with the treatment because the cream is not FDA approved, is for short-term use in patients who cannot use oral medication, is not evidence based, and has not been studied or peer-reviewed. Heather, however, testified that she uses the cream daily and benefits from that use. Even without Dr. Calodney's testimony, Heather was qualified to offer testimony as to her own health and her need for the cream. *See **Mo. Pac. R.R. Co. v. Robison***, 25 S.W.3d 251, 260 (Tex. App.—Beaumont 2000, no pet.) (stating that a jury may choose to be guided by expert testimony regarding future medical damages, but is not bound by it); *see also **City of San Antonio v. Vela***, 762 S.W.2d 314, 321 (Tex. App.—San Antonio 1998, writ denied).

Regarding the neurotomies and stem cell injections, we conclude that Dr. Calodney's testimony was reliable and legally sufficient for several reasons. First, Dr. Calodney's opinions were not formed solely for the purpose of testifying. Rather, his opinions were developed for the purpose of treating his patients, the Crists. *See **Crump***, 330 S.W.3d at 217 (stating that treating physician's diagnostic methodology had non-judicial uses because it was used to treat his patient); *see also **Robinson***, 923 S.W.2d at 559 (stating that "opinions formed solely for the purpose of testifying are more likely to be biased toward a particular result").

Second, the record is not limited to Dr. Calodney's subjective opinions. At the ***Daubert*** hearing, Dr. Calodney disagreed that neurotomies and stem cell injections have not gained general acceptance in the medical community. He testified that stem cell injections are generally

accepted among spine specialists, and that evidence supports the use of stem cells to treat the intervertebral disc. He admitted that the use of stem cell injections for back pain is not FDA approved and that there is no protocol for repeated injections. However, he did not view the injections as experimental because not all treatments are FDA approved or have set protocols.

Dr. Calodney testified that he had not published his own data, but a published paper by Ken Pettine showed that over a two year period, patients received an initial injection, experienced some relief, and benefited from an additional injection. He testified that this study conducted stem cell counts on each patient. He explained that doctors have a good idea as to how many stem cells a patient's bone marrow aspirate may contain based on the patient's age. He testified that the Pettine study, along with studies by Orozco, Mesoblast (an FDA sanctioned study), and EuroDISC, show quantifiable results. He further testified that an animal study by the Mayo clinic revealed "increase in disci . . . [and] signal intensity change within the disc." He had not seen studies beyond a two or three year period.

Dr. Calodney classified the neutotomy as an evidence based treatment because it is the "standard of care around the world to use radiofrequency ablation to treat the lumbar posterior elements." He explained that there is an acceptable range among the medical community regarding the length of time that a neurotomy lasts before needing to be repeated, i.e., six to eighteen months. He testified that a neurotomy can be repeated if necessary and that

> …the efficacy of repeat radiofrequency ablation has been studied, and it's about 85 percent. So almost nine out of ten people that get [a] good result from it the first time, will continue to get a good result if the procedure is repeated.

Specifically, Dr. Calodney cited a publication by Jerome Schofferman that demonstrates that eighty-five percent of patients had initial success and continued success with repeated neurotomies. He stated that the publication indicates patients had seven or eight procedures. He added that "it's the standard of care around the United States to repeat radiofrequency neurotomy at whatever interval is necessary to keep the patient pain-free." Accordingly, the record contains evidence indicating that both neurotomies and stem cell injections have been independently tested, peer-reviewed, and accepted within the relevant medical community.

Third, Dr. Calodney has extensive experience, knowledge, and training with regard to patients who suffer from spinal injuries and related pain. At the *Daubert* hearing, Dr. Calodney

identified himself as an interventional pain management physician and a twenty-four-year member of a neurosurgical practice that treats a variety of spinal injuries. He lectures on regenerative medicine, including stem cell injections and neurotomies, and has written on the subject of neurotomies. Dr. Calodney testified that his experience, combined with scientific literature, demonstrates that regenerative procedures are simple and can be very effective.

Dr. Calodney has utilized stem cell injections for approximately a decade in his own practice. He has observed how the injections have helped patients, and is aware of the length of time for which the injections provide relief. He admitted that not every patient responds to treatment, but that medical evidence shows that the "use of mesenchymal stem cell in the treatment of the intervertebral disc is efficacious both in restoring function as well as in decreasing pain." He identified a success rate of seventy to seventy-five percent, based on his patients' functionality before and after the injections, degree of pain, use of pain medication, physical examinations, and preclinical and laboratory work.

He further testified to treating his patients with neurotomies and explained as follows:

> We know that when we treat the medial branch nerve with radiofrequency neurotomy, that the nerve regenerates after a point of time. Whether that's six months -- three to six months, as Dr. Candido said; typically we get at least a year. So to opine that we're going to repeat it in 18 months is logical based upon the lesion that is made by the procedure and the recovery time of the nerve from the procedure. It's logical, and it works again when we repeat the procedure.

He testified that those patients have been successfully treated for fifteen or more years and have benefitted from repeated neurotomies. He stated that these patients are able to play with their children and grandchildren, play golf, return to work, avoid taking medication, and do what that they want to do despite their injuries.

Finally, Dr. Calodney provided a factual basis to support his opinions. He told the jury that, based on an MRI, Heather suffered from an annular fissure at the L4-5 disc and a smaller tear at the L5-S1 disc. A subsequent MRI revealed a protrusion at the L3-4 and L4-5 discs. He explained that the outer portion of the disc has several nerve endings and that a tear can be painful because discs are like shock absorbers, meaning that daily activities pressurize the disc and cause the tear to open and close. Thus, the pain from Heather's injuries is the type that fluctuates, as certain activities may exacerbate the injuries.

15

He testified that Heather initially underwent noninvasive treatments, such as medication and chiropractic care. When her condition did not improve, they utilized more invasive treatments, including a neurotomy. Dr. Calodney testified that a neurotomy typically provides longer periods of relief, lasting six to eighteen months. He explained that the procedure treats the small joints located at the back of the spine. During a neurotomy, a needle is placed adjacent to the problematic joint, and the nerve, known as a medial branch, is treated with a rapid, alternating current of radio frequency. He testified that the frequency causes molecules near the tip of the needle to create friction, which generates the heat that modulates and blocks the nerve. Dr. Calodney testified that radio frequency is used to treat a variety of medical conditions, such as heart arrhythmias. He explained, "We are able to take the pain away from the joint by blocking that nerve over a period of about a year with radiofrequency ablation."

Dr. Calodney testified that, although the neurotomy did not completely alleviate Heather's pain, she received significant relief, such that she could return to some of her previous activities. Heather testified that she received greater relief from the neurotomy than any other treatment. Dr. Calodney testified that repeating the neurotomy every eighteen months for someone who has responded to a previous neurotomy is a conservative projection.

The jury heard evidence that even Dr. Candido supported a limited use of neurotomies. Dr. Candido testified that a neurotomy typically lasts three to six months, and sometimes nine to fifteen months. He admitted performing neurotomies on patients with the same complaints as the Crists. He explained that there is no evidence based medicine that shows a patient requires such treatments over a prolonged period. However, he believed that if a patient had benefitted from a neurotomy, the patient could undergo three or four procedures, but not in perpetuity.

Regarding stem cell injections, Dr. Calodney explained that a patient's bone marrow, which contains the stem cells, is drawn, concentrated, and injected into the patient's discs. He testified that these stem cell treatments are used in sports medicine and are common treatments for musculoskeletal injuries. Dr. Calodney admitted that stem cell injections are not FDA approved, but that they are not considered experimental in the community of spine specialists. He referred to Pettine's 2015 study that utilized the treatment over a two to three year period. He explained that stem cell injections are an up-and-coming therapy and help treat the painful intervertebral disc.

16

Dr. Calodney also identified a simpler alternative, platelet-rich plasma, which involves taking the patient's plasma and concentrating it. He testified that the plasma contains proteins, cytokines, and platelet granules, which allow the body to heal itself. The platelet mixture is then used to treat a variety of musculoskeletal issues, including discs. He described the procedure as planting a seed in a garden and explained that it takes two to three months to see a difference because the body has to actually change in response to the injection. He testified that Heather would first try the platelet-rich plasma treatment. The stem cell treatment would likely follow.

Although Heather had not received a stem cell injection at the time of trial, Chip testified that he had received an injection. He testified that the injection took some time to reveal results, but that he did experience some relief from the injection. He later received a second injection and the results were "pretty good."

Dr. Candido testified that stem cell injections are not evidence-based medicine or FDA approved, and are experimental. He explained that there are no studies that have been conducted to compare a stem cell group with a placebo group, and there is no hardcore evidence showing that the injections make a difference. He explained that the spine contains no nourishment for the cells because there is no oxygen or glucose in the disc, and the blood flow in the disc is poor. He added that the spine is always mobile, so it is an unfavorable environment for stem cells. Thus, he does not use stem cell injections to treat discs. Nevertheless, he believed that it was not unreasonable to try the treatment. He disagreed with using the injections on a repeated basis.

Based on our review of the record, we conclude that Dr. Calodney's testimony regarding the reasonableness and necessity of the challenged treatments is based on a sufficiently reliable foundation under the *Robinson* factors and the analytical gap test. *See Crump*, 330 S.W.3d at 220. Dr. Calodney's testimony was not required to be conclusive. *See id.* at 218. Once the evidence was admitted, any "gaps" that remained between the data and the conclusions drawn from it went to the weight of Dr. Calodney's testimony, not its reliability. *See id*. at 220.

As fact finder, the jury was entitled to consider the competing expert opinions and to decide which testimony to credit. *See Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied) (stating that "[i]n a battle of competing experts, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony."). In doing so, the jury could reasonably conclude that Heather would benefit from repeated neurotomies, particularly in light of evidence that patients with spinal injuries had experienced relief from

repeated neurotomies, according to both Dr. Calodney and other studies.  The jury also heard Heather's own testimony that she had received relief from the treatment in the past.  Additionally, the jury was entitled to credit Dr. Calodney's testimony that stem cell injections could be used to treat painful spinal injuries and to reject contrary testimony.  This is especially true given Chip's testimony that the treatment had offered him some relief in the past and Dr. Candido's own admission that it was not unreasonable to try the treatment.  And, as previously stated, the jury could rely on Heather's testimony regarding the benefits of the pain cream.  *See Robison*, 25 S.W.3d at 260; *see also Vela*, 762 S.W.2d at 321.  Thus, viewing the evidence in the light most favorable to the jury's verdict, we conclude that reasonable and fair-minded jurors could have reached the verdict under review.  *See Camacho*, 298 S.W.3d at 638; *Wilson*, 168 S.W.3d at 827.  We overrule issue nine.

<h2 style="text-align:center">AMOUNT OF DAMAGES</h2>

In issue ten, Horizon contends that the evidence is legally and factually insufficient to support the jury's award of future medical damages.  Specifically, Horizon complains that the jury awarded more in damages than Dr. Calodney testified was reasonable and necessary.[3]

**Applicable Law**

To be entitled to damages for future medical care, a plaintiff must show a reasonable probability that such medical expenses will be incurred in the future.  *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied).  A jury may award damages for future medical care based on the nature of the plaintiff's injuries, medical care rendered before trial, and the plaintiff's condition at the time of trial.  *Id*.  "An award of future medical expenses lies largely within the jury's discretion."  *Id*.  "Because issues such as life expectancy, medical advances, and the future costs of products and services are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages."  *Id*.

---

[3] Embedded in its argument that the future damages awards are not supported by the evidence, Horizon briefly states "no evidence supports the jury's award of past and future damages." Horizon provides no analysis regarding the awards for past damages. Accordingly, we do not construe issue ten as including a challenge to the jury's awards of past damages. *See* TEX. R. APP. P. 38.1(i); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) ("The Texas Rules of Appellate Procedure require adequate briefing[]"); *In re Guardianship of Allen*, No. 12-14-00249-CV, 2015 WL 7280894, at *4 (Tex. App.—Tyler Nov. 18, 2015, no pet.) (mem. op.).

## Analysis

Dr. Calodney testified to $266,697 in future medical care for Heather and $317,752 for Chip. However, the jury awarded $300,000 to Heather and $334,146 to Chip in future medical damages. Although these amounts exceed Dr. Calodney's projections, the jury could reasonably conclude that the Crists' injuries, medical care they received before trial, and their conditions at the time of trial justified awards in excess of the amounts testified to by Dr. Calodney. *See id*.

Specifically, Heather testified that she feels back pain daily. On a good day, her pain level is three to four, and seven to nine on a bad day. She believed that, as a whole, her condition has declined. Chip likewise believed that his condition had grown worse. He described his pain level as a two or three on a good day, and an eight or nine on a bad day. Both Dr. Calodney and Dr. Candido believed that the Crists' conditions are chronic and they will likely experience pain for the remainder of their lives. Additionally, the jury heard evidence that, although Dr. Calodney limited his testimony to fifteen years, the Crists' life expectancy exceeds fifteen years. Dr. Candido agreed that fifteen years was a conservative estimate.

The jury also heard Dr. Calodney testify that his projections for future medical care were based on current costs and were probably too low. Dr. Calodney explained that the surgery he recommended for Chip would not be a one-hundred percent cure. He testified that there is a sixty percent chance of a need for another surgery, which he did not include in his projections. Regarding Heather, Dr. Calodney testified that

> . . . it's not like at 15 years a light switch is going to go off and she's going to stop having problems. But it's hard to accurately project beyond a 15-year time frame, although I do agree with Dr. Candido in that she's more likely than not going to have problems due to this for the rest of her life.

When asked whether the Crists would be able to function at the same level without future treatment, Dr. Calodney responded that it would be impossible. Dr. Candido agreed that the Crists would need future treatment.

No precise evidence is required to support a jury's award of future medical damages, and the jury was not bound by the expert testimony when determining the amount to award. *See Vela*, 762 S.W.2d at 321. The jury was entitled to take the nature and extent of the Crists' injuries into account, as well as their progress toward recovery, the reasonable cost of past treatment, and their physical conditions at trial. *See Antonov*, 168 S.W.3d at 908; *see also Vela*,

762 S.W.2d at 321.  The jury could reasonably conclude that uncertain medical costs, the Crists' chronic conditions, and the Crists' life expectancy necessitated greater medical care than that described by Dr. Calodney.  Accordingly, the jury was within its discretion to determine that the Crists' need for future medical treatment and the reasonable cash value of such treatment and expense exceeded that testified to by Dr. Calodney.  *See **Antonov***, 168 S.W.3d at 908; *see also **Vela***, 762 S.W.2d at 321.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support the jury's awards of future medical damages.  *See **Wilson***, 168 S.W.3d at 824.  The awards are not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.  *See **id***. at 826.  We overrule issue ten.

## CONCLUSION

Having sustained issues four, five, and six, we ***reverse*** the judgment as to the Crists' claims for negligent entrustment, gross negligence, and exemplary damages, and ***render*** judgment that the Crists take nothing on those claims.  Having overruled Horizon's other issues, we ***affirm*** the trial court's judgment in all other respects.

**GREG NEELEY**
Justice

Opinion delivered March 15, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 15, 2017**

**NO. 12-16-00045-CV**

**JEREMY ONEY AND HORIZON CABLE SERVICE, INC.,**
Appellants
V.
**WILLIAM CRIST AND HEATHER CRIST,**
Appellees

Appeal from the 124th District Court

of Gregg County, Texas (Tr.Ct.No. 2013-1615-B)

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment as to the claims of **WILLIAM CRIST AND HEATHER CRIST**, Appellees, for negligent entrustment, gross negligence, and exemplary damages be **reversed** and judgment is **rendered** that Appellees take nothing on those claims. The trial court's judgment is **affirmed** in all other respects. It is further ORDERED ADJUDGED and DECREED that all costs of this appeal are hereby adjudged against the Appellants, **JEREMY ONEY AND HORIZON CABLE SERVICE, INC.**; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*